UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

JAMES B. MARKSBURY )
 )
    Plaintiff, )
 )
 ) No. 5:09-CV-24-REW
v. )
 ) MEMORANDUM OPINION & ORDER
SCOTT ELDER, et al., )
 )
    Defendant. )
 )

*** *** *** ***

Defendants Scott Elder and the City of Harrodsburg, Kentucky, filed a motion for summary judgment. DE #61 (Motion). Plaintiff, James Brian Marksbury, filed a Response (DE #64), and Defendants replied (DE #73). The Court has considered the record, including the First Amended Complaint (DE #18) and the parties' memoranda and exhibits thereto, as well as the balance of filings and papers docketed in this case. For the reasons and on the terms set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion (DE #61).

**I.**     **Relevant Background**[1]

On December 26, 2007, Marksbury consumed approximately a pint and a half of whiskey over the course of about three hours; then, at 3:00 or 4:00 p.m., he set out to drive to his brother-in-law's house. DE #26-3 (James Brian Marksbury June 7, 2010, Deposition Transcript ("Marksbury Depo.")), at 15-16. Along the way, Marksbury hit at least one other car. *Id.* at 19. At some point, Marksbury's vehicle began to slide sideways; the brakes locked, and the car left

---

[1] As it must for the purposes of summary judgment, the Court sets forth the version of facts most favorable to Marksbury, the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986).

1

the road, allegedly colliding with a telephone pole. *Id.* at 20. Marksbury got out of the car to assess the damage. *Id.* at 21.

There is significant dispute over the players and roles, and the Court focuses on Plaintiff's allegations:

Defendant Scott Elder, then a City of Harrodsburg police officer, arrived and told Marksbury to get back into his car. *Id.*[2] Marksbury did not comply with Elder's instructions. *Id.* at 39. Marksbury was upset, and he began cursing. *Id.* at 22. When Elder appeared to hurt himself on something in his own pocket, Marksbury laughed and called Elder a "dumb SOB." *Id.* at 22. Elder became upset, placed Marksbury in a full nelson, and started to force Marksbury face-first into the hood of the police cruiser. *Id.* Marksbury pushed back; Marksbury and Elder fell to the ground, with Marksbury landing on top of Elder. *Id.* At that point, Marksbury relented and allowed Elder to place handcuffs on him. *Id.* Elder closed the handcuffs forcefully, and Marksbury screamed for Elder to remove them. *Id.* Elder complied and allowed Marksbury to stand up, but then Elder unexpectedly hit Marksbury in the back of the head causing Marksbury to fall forward onto the ground. *Id.* at 22-23. Marksbury's wrist was severely hurting, and he resisted being re-handcuffed. *Id.* at 23. Elder placed his arm in front of Marksbury's head and jerked Marksbury's neck backwards, at which time Marksbury could hear his neck "popping and crackling." *Id*; *id.* at 65-66. Elder then directed Marksbury to place his arms out to his side. *Id.* at 23.

By the time other officers arrived at the scene, Elder had handcuffed Marksbury, with Plaintiff's hands bound behind his back. *Id.* at 24-25. Shortly thereafter, Marksbury passed out

---

[2] Defendants are adamant that Harrodsburg Police Officer Jason Elder and Mercer County Deputy Sheriff Rick Moberly – not Scott Elder – dealt directly with Marksbury at the scene of the accident. DE #73 (Reply), at 4 (citing deposition testimony of Scott Elder and Jason Elder).

2

in the back seat of Elder's police cruiser. *Id.* at 26. Elder drove Marksbury to Haggin Hospital for a blood alcohol test. DE #26 (June 7, 2010, Deposition of Scott Elder ("Scott Elder Depo.")), at 20; Marksbury Depo. at 26. Throughout the trip to the hospital, Marksbury was belligerent and threatened Elder with physical violence. Scott Elder Depo. at 20-21; DE #31-5, at 15 (Use of Force Report).

Marksbury has **no independent recollection** of the events that occurred at the hospital. Marksbury Depo. at 59. However, recorded silent surveillance footage shows the full incident. DE #66 (Surveillance Footage). Elder helped Marksbury from the police cruiser, at which time Marksbury was wearing handcuffs with his hands still behind his back. *Id.* Elder removed the handcuffs from Marksbury's hands and moved Marksbury's hands to his head. *Id.* Marksbury turned to face Elder, and Elder started to reapply the handcuffs, beginning with Marksbury's right hand. *Id.* Marksbury unambiguously made a striking motion toward Elder's hands, and Elder immediately forced Marksbury to the ground. *Id.* The parties dispute whether Marksbury's hand movement was aggressive. The video plainly shows that Marksbury tried to strike Elder in the area of his hand.

The blood-alcohol test from Haggin Hospital confirmed Marksbury was intoxicated, with a blood-alcohol content of 0.29. DE #31-5, at 14 (Report of Laboratory Examination). Marksbury was taken via airlift from Haggin Hospital to the University of Kentucky Hospital. *See* Scott Elder Depo. at 54. Marksbury did not regain consciousness until approximately 2:00 a.m. at UK Hospital. Marksbury Depo. at 36. UK ultimately discharged Marksbury with instructions to wear a neck brace and take prescribed medication. *Id.* at 36. Plaintiff has provided no medical evidence, at this point, to substantiate various neck and wrist injuries he ties to the events of December 26, 2007.

3

Plaintiff filed this lawsuit against Elder, the City of Harrodsburg, Kentucky, Rick Moberly, and Jason Elder under 42 U.S.C. § 1983 and Kentucky state law. The Court previously granted summary judgment on behalf of Jason Elder. DE #46 (Opinion & Order). Marksbury voluntarily dismissed his claims against Rick Moberly. DE #71 (Joint Motion); DE #72 (Order). Thus, only Marksbury's claims against Scott Elder and the City of Harrodsburg remain.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine issue of material fact rests initially with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d

---

[3] On December 1, 2010, the language of the summary judgment standard changed. However, the language changes have not altered the standard itself. *See* Fed. R. Civ. P. 56 advisory committee's note (2010) ("The standard for granting summary judgment remains unchanged."). The Court applies the newest Rule 56 language here, finding, per the standard articulated in the United States Supreme Court's order adopting the rules amendments, application of the amended language to be just and practicable.

4

at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). Where, as here, the defendant is the moving party, "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 106 S. Ct. at 2514. However, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as an essential element. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*; *cf. Matsushita*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be admissible at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006). Rule 56©(3) permits, but does not require, the Court to peruse the full record.

## III. Analysis

Marksbury asserts claims against Elder, in his official and individual capacities, and the City of Harrodsburg under both federal and Kentucky law. The First Amended Complaint is no

5

model of pleading clarity, but the parties apparently agree that Marksbury's federal-law claims, as pled, are for (1) excessive force, (2) unreasonable search and seizure, and (3) failure to properly train or supervise, and that his state-law claims are for (1) excessive force, (2) assault, (3) outrage, and (4) as a mysterious amalgam, negligent, reckless, wanton, intentional conduct violating tort law.

As is discussed further below, the case really is about the legal and factual posture of the two separate application-of-force events—the initial arrest in the field and the interaction at Haggin Hospital. The defense focuses only on identity proof as to the initial arrest, contending that there is no triable question over whether Scott Elder himself applied force to Plaintiff. The defense argues qualified immunity, and various other substantive theories, with respect to the hospital incident.

This is the summary judgment stage, and the Court does find that there is enough record evidence regarding Scott Elder's disputed role to require factual findings about the field arrest. Elder is, however, entitled to qualified immunity as to the hospital confrontation because the video conclusively shows no constitutional violation.

A. § 1983 Official-Capacity Claims (Elder and Harrodsburg)

Defendants ask the Court to dismiss the claims against Elder in his official capacity because they are effectively claims against Harrodsburg, which is also a defendant. To the extent Plaintiff pursues separate official-capacity claims, or claims premised on vicarious liability under § 1983, those causes of action fail as a matter of law.

> Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

*Kraemer v. Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 98 S. Ct. at 2036. Instead, liability attaches only if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.*

The Court must dismiss as redundant Marksbury's § 1983 claims against Elder in his official capacity. *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 708 (W.D. Ky. 2001). Moreover, Harrodsburg is not liable under § 1983 for Elder's conduct because Marksbury does not contend that Elder acted pursuant to an official municipal policy. The Court therefore **GRANTS** Defendants' motion for summary judgment on Marksbury's official-capacity and vicarious liability claims under § 1983.

> B. § 1983 Individual-Capacity Claims (Elder)

Elder asserts the § 1983 claims against him in his individual capacity fail on their merits and, as to the hospital incident, because Elder is entitled to qualified immunity.

> *1. Excessive Force*

A claim of excessive force in the context of an arrest "invoke[s] the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons … against unreasonable … seizures' of the person." *Graham v. Connor*, 109 S. Ct. 1865, 1071 (1989). In considering an excessive force claim, the Court must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 1872. The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 1871. Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" and the determination must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

The Court employs a familiar analysis in evaluating qualified immunity. As the Sixth Circuit summarized in *Livermore ex rel. Rohm v. Livermore*, 476 F.3d 397, 403 (6th Cir. 2007):

> "Through the use of qualified immunity, the law shields 'governmental officials performing discretionary functions ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Solomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 172 (6th Cir.2004) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court instructs lower courts to perform a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Courts should first determine whether "the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.* If the plaintiff establishes that a constitutional violation occurred, a court must next consider "whether the right was clearly established." *Id.* When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

Thus, the Court must accept Plaintiff's factual version and determine whether that version would establish a constitutional violation. Then, as a separate inquiry, the Court must assess the clarity of the right at issue. Plaintiff, again, has the burden on these topics.

Plaintiff claims Elder applied excessive force when he first arrested Marksbury at the scene of the accident and again when he forced Marksbury to the ground outside Haggin Hospital. Elder does not argue the substance of incident one, under the qualified immunity rubric, but rather contends that he was not the officer who applied force in the field. In terms of

evidentiary weight, Elder is better positioned. After all, Scott and Jason Elder each testified that Scott Elder applied no force at the field arrest, and Plaintiff's recollection suffers the plain credibility dings of alcohol impairment and lack of direct knowledge as to Scott Elder's identity.[4] Still, again, summary judgment is not about making credibility findings. There is a factual question as to Scott Elder's role, in the Court's view, because of several specific things evident in the record.

First, Scott Elder authored the KYIBRS report, located at DE #31-1 in the record, which directly indicates that Scott Elder was involved in the initial arrest. In that report, Elder states: "I advised the suspect that he was under arrest . . . . The subject began an attempt to pull away from officers. **The subject attempted to push officers down and at that point we forced the subject to the ground and placed him into handcuffs**." DE #31-1, at 3 (emphasis added). This admission addresses the field arrest and plainly involves Elder in the act of forcing Plaintiff to the ground and cuffing him. This departs significantly from both Elders' deposition accounts, and it is nothing like the Marksbury version. Yet it does, in Scott Elder's own words, make him a direct player in the field arrest. Even in deposition, Scott Elder conceded that he was at least in the umbra of action: "[W]hen I lifted him up off the ground, we went to my car." Scott Elder Depo. at 22; *id.* at 19 ("I helped lift him off the ground and that's when I took custody[.]").

The inconsistencies in the Elders' versions also matter. Jason Elder believed that Scott Elder was the first to arrive on the scene, which is the reason Scott Elder became the investigating officer. DE #58 (Jason Elder June 30, 2011, Deposition Transcript ("Jason Elder Depo."), at 25, 29. Scott Elder said he was the fourth or fifth officer to arrive. Scott Elder Depo. at 13. Marksbury claims that there was but one officer on the scene when the excessive force

---

[4] Why Plaintiff never got or took the chance to eyeball and thus identify Scott Elder during this civil case is an unexplained proof gap.

9

occurred. Marksbury Depo. at 24. While Marksbury did not identify Scott Elder from personal knowledge, the combination of his and Jason Elder's versions would place Scott Elder on the scene, alone, with Marksbury. Additionally, the absence of a "use of force" report from Jason Elder is some evidence that he, in fact, was not involved in the original takedown. Jason Elder testified that the Harrodsburg Police Department would require such a report as a policy matter when a takedown, like the one here, occurred. Jason Elder Depo. at 39, 47. He did not make a report, but Scott Elder did make one as to the hospital events. *See* DE #3-15, at 15-16 (Use of Force Report). Again, this is some evidence that would undercut Jason Elder's alleged role in subduing Marksbury.

The evidence is comparatively slight but is enough to create a triable issue as to Scott Elder's role. A jury could determine that Scott Elder was first on the scene, and if that jury accepted Marksbury's version, fanciful or not, such a result would be in the jury's province. The defense did not argue the merits of the first incident beyond the officer's identity, so that claim must be resolved at trial.[5]

Under *Graham*, the Court finds that Scott Elder did not use excessive force outside the hospital. The totality assessment compels the finding. Plaintiff is a large man. *See* DE #31-5, at

---

[5] The theory on which Plaintiff basis his handcuffing claim is not clear from his First Amended Complaint and brief in opposition to summary judgment, and Defendants have not placed at issue the merits of that claim beyond the involved officer's identity. Nonetheless, the Court observes without deciding that there appears to exist a factual hole in Marksbury's claim. To survive summary judgment on a handcuffing claim, "a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury resulting from the handcuffing.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005)). The Court perceives no evidence that Elder—assuming he performed the allegedly too-tight handcuffing—ignored Marksbury's complaints. To the contrary, Marksbury testified that Elder removed Marksbury's handcuffs at the scene of the accident when Marksbury complained, and Elder again agreed to adjust the handcuffs at Haggin Hospital. This will be a serious hurdle at trial.

15 (Use of Force Report, listing Marksbury as 6'4" and 240 pounds). Marksbury had just been arrested at the end of a multi-county hit-and-run spree that would result in, among other things, felony wanton endangerment charges. *See* DE #31-5, at 1-5 (Kentucky Uniform Police Traffic Collision Report). He was intoxicated. He admits he had resisted arrest repeatedly at the time of the field incident. Marksbury Depo. at 52, 58. Even per his own version, Marksbury had ended up on top of the arresting officer during the field incident when the two were alone. Per Scott Elder, Marksbury had been belligerent throughout and made repeated direct physical threats to Elder during the ride to the hospital. Elder himself may not have viewed these threats as particularly worrisome, but the force assessment rests on objective rather than subjective evaluation.

As to the events outside the hospital entrance, the video surveillance removes any need to filter the facts through the story of either participant, and indeed, Plaintiff himself has no recollection of the events. The Supreme Court has deferred to definitive video in the excessive force and qualified immunity context. *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007) (calling such a video, on that "captur[es] the events in question," an "added wrinkle" that affects the normal summary judgment analysis). This Court does the same.

The tape shows that Elder removed Marksbury's cuffs. The testimony is that Elder did this at the request of Plaintiff, who was uncomfortable with the cuffs behind him. As Elder began to re-apply the cuffs in the front, Marksbury unmistakably swung at Elder's hand. DE #66, at 4:28:02-4:28:07. This was no "benign gesture" as Plaintiff contends—it was a direct and aggressive act of resistance against Elder's legitimate effort to re-cuff the inebriated suspect in preparation for entering a public hospital. Marksbury's actions communicated plainly that he would not be re-cuffed and would employ physical aggression to avoid the restraint. Elder's

11

split-second decision to retake immediate control of Marksbury's person in the manner he did was objectively reasonable. Simply put, Marksbury has no constitutional right to avoid the force employed in this context, a force (and force intensity) Plaintiff himself precipitated. Once Elder had Marksbury on the ground, the force effectively ended, and Elder soon returned Plaintiff to a standing position.

Per *Graham*'s reasonableness standard, Elder confronted a large and inebriated suspect who had voiced threats and acted with resistance already. He now was unrestrained and in a public setting. Elder was alone. When Marksbury swung at Elder's hand, Elder was fully entitled, in that stressful moment, to end the resistance and again place Marksbury under restraint. In the Court's view, Elder did so through application of force that was not excessive, taking into account and balancing all competing interests. Finding no violation under *Saucier*'s first step, the Court **GRANTS** summary judgment regarding the excessive force claim as to the hospital incident.[6]

### 2. *Unconstitutional Search and Seizure*

Elder argues that Marksbury cannot succeed on a claim that his arrest constituted an unconstitutional seizure under the Fourth Amendment because Marksbury does not contest that the officers had probable cause to arrest him. Marksbury did not respond to this argument, and the Court agrees with Elder. Whether an arrest is "constitutionally valid depends … on whether, at the moment the arrest was made, the officers had probable cause to make it." *Beck v. State of Ohio*, 85 S. Ct. 223, 225 (1964). Because Marksbury does not contest that probable cause

---

[6] The Court recognizes the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), receded from the rigid approach prescribed in *Saucier*, permitting lower courts, in their discretion and in light of the circumstances of the particular case at hand, to consider the two prongs in either order. In this case, the Court finds the traditional approach—first considering whether a constitutional violation has occurred—is appropriate.

12

existed to arrest him, Elder is entitled to judgment as a matter of law to the extent Marksbury claims his arrest was an unconstitutional seizure in violation of the Fourth Amendment. Without elaboration, the record supports that Marksbury was inebriated, had hit several cars on the way to the destination, and was disorderly. Cause to arrest surely supported the imposition of custody, and Marksbury later pled guilty to multiple related charges. *See* Marksbury Depo. at 42-43. The Court **GRANTS** Elder's motion for summary judgment on that claim.

### C. § 1983 Failure to Train or Supervise (Harrodsburg)

Marksbury alleges Harrodsburg is liable under § 1983 for failing to adequately train Elder and the other two officers involved in his arrest. DE #18 (Amended Complaint), ¶ 11. A plaintiff must prove three things to succeed on a failure-to-train claim: "[1] that a training program is inadequate to the tasks that the officers must perform; [2] that the inadequacy is the result of the city's deliberate indifference; and [3] that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (quoting *City of Canton, Ohio v. Harris*, 109 S. Ct. 1197, 1205-06 (1989)). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 390.

Harrodsburg ascribes to what both sides call a well-known policy on the use of force, the "force continuum," and requires that all officers receive annual instruction on the policy. DE #64-3 (Response to Resistance Policy); *see also* DE #64 (Response), at 10. At his deposition, Elder was unable to articulate in detail the force continuum, and he testified he had not received training on the policy in a couple of years. Scott Elder Depo. at 50. However, Elder had not worked for the City of Harrodsburg for approximately one year at the time of his deposition. *Id.*

13

at 7-8. Elder also stated in his deposition that review of the force continuum was part of the officers' yearly in-house training in Harrodsburg; he also testified to coverage of use-of-force principles at the state academy. *Id.* at 50. Jason Elder testified officers received a copy of the policy each year and were expected to review the policy independently. Jason Elder Depo. at 60. He also confirmed force control continuum training at the academy. *Id.* at 69.

Training as to appropriate use of force without a hands-on component may be inadequate. *E.g.*, *Martin v. City of Broadview Heights*, No. 1:08 CV 2165, 2011 WL 3648103, at *9 (N.D. Ohio Aug. 18, 2011), *as amended*, 2011 WL 5361062 (N.D. Ohio Oct. 31, 2011). But even if there was evidence of a causal relationship between the training and Marksbury's alleged injury (which the Court does not decide), Marksbury cannot establish that the claimed inadequacy here reflects deliberate indifference on the part of Harrodsburg. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 117 S. Ct. 1382, 1391 (1997). Typically, a plaintiff establishes deliberate indifference through "prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Marksbury has presented no evidence of previous instances in which Harrodsburg police officers have allegedly used excessive force.

Alternatively,

> in a narrow range of cases, … [t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice – namely, a violation of a specific constitutional or statutory right.

*Brown*, 117 S. Ct. at 1391. To succeed under the second method, "the record must show 'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Harvey v. Campbell Cnty., Tenn.*, No. 09-5041, 2011 WL 1789955, at *10 (6th Cir. May 10, 2011) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). Even assuming the only effort Harrodsburg made to train its officers on the use-of-force policy, in augmentation of basic training, was placing a copy of the policy in each officer's mailbox, Plaintiff presents no evidence that failure to do more rendered almost certain that officers would employ excessive force. The Court therefore **GRANTS** Harrodsburg's motion as to Marksbury's § 1983 failure-to-train claim. All § 1983 claims against the City thus fail.

D. State-Law Claims – Excessive Force and Assault[7]

---

[7] Of Marksbury's four nominal substantive state-law claims, Defendants moved for summary judgment explicitly with respect to the claims for excessive force and assault, not with respect to outrage and negligence/intentional tort. However, the Court views the outrage claim as withdrawn, per the representations of Plaintiff earlier in the case. *See* DE #52 (Order). Additionally, because this is an excessive force claim, the applicable tort theory is assault and battery, not negligence. *See Ali v. City of Louisville*, No.3:05CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006) (discussing KRS § 431.025 and stating: "The officer is liable for the intentional tort of battery, not for negligence, when he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee."). The Court thus treats the state claims at issue and pending as excessive force and assault/battery. That Plaintiff made no detailed response on summary judgment hastens this analysis.

Defendants also reiterated their argument that Elder's conduct in arresting Marksbury did not constitute an unconstitutional search and seizure, but Marksbury did not assert that claim pursuant to Kentucky law. In any event, "Section 10 of the Kentucky Constitution is coextensive with, and provides no greater protection than, the Fourth Amendment to the U.S. Constitution." *Bankston v. Commonwealth*, No. 2006-CA-001884-MR, 2007 WL 2744616, at *3 (Ky. Ct. App. Sept. 21, 2007). Thus, for the reasons set forth above with respect to Marksbury's claim for unreasonable seizure under § 1983, Defendants would also be entitled to summary judgment on a corresponding state-law claim.

Pursuant to KRS § 431.025, Kentucky police officers must not use "unnecessary force or violence" in arresting a suspect. They may, however, use such force as appears necessary or reasonable to take a person into custody. *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (1973). An officer may be liable for using excessive force in accomplishing an arrest if he either (a) "has reasonable grounds to make the arrest but used more force than was necessary," or (b) "only used necessary force in effecting the arrest but there were, in fact, no reasonable grounds for the arrest." *Wilkerson v. City of Frankfort, Ky.*, Civil Action No. 3:08-12-DCR, 2009 WL 1033828, at *10 (E.D. Ky. Apr. 1, 2009) (citing *Dunn v. Felty*, 226 S.W.3d 68, 74 (Ky. 2007)). The same standard applies to assault claims against police officers; the tort and statutory claims effectively merge. *E.g.*, *Wilkerson*, 2009 WL 1033828, at *10; *Simms v. City of Harrodsburg*, Civil Action No. 06-CV-104-JMH, 2007 WL 2792174, at *6 (E.D. Ky. Sept. 21, 2007).

Whether Elder handcuffed and otherwise applied force to Marksbury at the scene of the accident is a question for the jury; Defendants did not address and the Court therefore does not reach the substance of that claim. However, the Court has determined, as a matter of federal law, that Elder did not use excessive force in the takedown at Haggin Hospital. Kentucky's courts have discussed *Graham* as yielding "similar substantive results" to analysis of excessive force under state law. *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (also performing parallel immunity analysis under *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001)). Thus, the state-law claims of this variety persist only to the extent a fact question remains concerning the force used in the field arrest.[8] The Court **GRANTS** Defendants' motion for

---

[8] Neither Harrodsburg nor Elder argues entitlement to summary judgment based on any affirmative defense. The Court notes, incidentally, that qualified immunity under *Harlow*, 102 S. Ct. 2727, does not apply to state-law claims. *Lamb v. Holmes*, 162 S.W.3d 902, 908 (Ky. 2005). Defendants do not argue *Yanero* immunity under Kentucky law.

summary judgment on Marksbury's state-law claims to the extent they relate to the altercation at Haggin Hospital and **DENIES** the motion with respect to the encounter at the scene of the accident.[9]

   E.   Punitive Damages

Finally, Defendants claim neither Harrodsburg nor Elder in his official capacity can be liable to Marksbury under federal or state law for punitive damages. Marksbury does not dispute that issue, and the Court agrees. The official-capacity claims are treated as claims against Harrodsburg, and neither § 1983 nor Kentucky law permits an award of punitive damages against a municipality. *City of Newport v. Fact Concerts, Inc.*, 101 S. Ct. 2748, 2762 (1981); *Dempsey v. City of Lawrenceburg*, Civil Action No. 3:09-33-DCR, 2010 WL 3825473, at *8 (E.D. Ky. Sept. 2, 2010), *motion to amend denied*, 2010 WL 3924525 (E.D. Ky. Sept. 29, 2010). The Court **GRANTS** Defendants' motion as to Marksbury's claim for punitive damages against the City of Harrodsburg and Elder in his official capacity.

With respect to the claim against Elder individually, Elder argues there is no evidence he willfully and intentionally violated Marksbury's constitutional rights, acted with reckless or callous indifference to Marksbury's constitutional rights, or acted toward Marksbury with oppression and fraud or gross negligence, as required to sustain a claim for punitive damages. *See Smith v. Wade*, 103 S. Ct. 1625, 1640 (1983) (punitive damages permitted in § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

---

[9] Although Harrodsburg did not argue to the contrary, the Court notes for clarity's sake that Harrodsburg could be vicariously liable under state law for Elder's actions. *Hughes v. City of Louisville*, Civil Action No. 3:02CV-60-S, 2007 WL 1035008, at *10 (W.D. Ky. Mar. 28, 2007) ("under Kentucky law, a municipality may be held liable for the actions of a police office in making an unnecessary assault upon an individual in carrying out an arrest under a *respondeat superior* theory"); *City of Lexington v. Yank*, 431 S.W.2d 892, 895 (Ky. 1968) ("principal-agent and master-servant relationships within the scope of the respondeat superior doctrine do exist between a municipal corporation and its officers and employees").

17

involves reckless or callous indifference to the federally protected rights of others"); KRS § 411.184(2) ("A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."). However, a restrained criminal defendant has the right not to endure gratuitous violence. *See Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (discussing "unconstitutionality of the use of gratuitous force against helpless and incapacitated suspects during arrest"). Marksbury's version of the field arrest could, in theory and if proven, warrant a punitive damages instruction. *See* Marksbury Depo. at 21-23.

Plaintiff's story is that Elder was not, at least initially, arresting him but rather ordering him back into his vehicle. Marksbury mocked Elder for hurting his hand, and Elder then angrily proceeded to arrest Plaintiff. This purportedly led to a scuffle and, eventually, to Elder striking Plaintiff gratuitously in the head and knocking him unconscious and then wrenching Plaintiff's neck, even after Elder had gained control of Marksbury. This may be a dubious story, in the context of all witness statements, but if proven the version could support a punitive-damages instruction under the applicable standards.

Marksbury may proceed to trial on his claims for the use of excessive force during his initial apprehension in the field (a) under § 1983 against Elder in his individual capacity, and (b) under Kentucky law against Elder and the City of Harrodsburg. The Court **DISMISSES WITH PREJUDICE** all other claims.

This the 17th day of November, 2011.



Signed By:
*Robert E. Wier*  R̃ẼW̃
United States Magistrate Judge